# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 23 2020, 8:35 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark F. James
Anderson, Agostino & Keller, P.C.
South Bend, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| S.V., <br> *Appellant-Respondent,* <br><br> v. <br><br> T.B., <br> *Appellee-Petitioner.* | September 23, 2020 <br><br> Court of Appeals Case No. 20A-PO-635 <br><br> Appeal from the St. Joseph Circuit Court <br><br> The Honorable John E. Broden, Judge <br> The Honorable Andre B. Gammage, Magistrate <br><br> Trial Court Cause No. 71C01-1911-PO-834 |

**Pyle, Judge.**

# Statement of the Case

S.V. ("S.V.") appeals the trial court's issuance of an order of protection against her and in favor of T.B.("T.B."), arguing that there was insufficient evidence to support the issuance of the protective order. Concluding that the evidence is sufficient, we affirm the trial court's grant of the protective order in favor of T.B.

We affirm.

# Issue

> Whether there is sufficient evidence to support the trial court's issuance of a protective order against S.V.

# Facts[1]

Prior to October 14, 2019, T.B. and her seventeen-year-old-son, C.F. ("Son"), had been employees of S.V. The parties apparently had a dispute about money that S.V. may have owed to T.B. and Son. On October 14, 2019, T.B. and Son went to court to challenge an *ex parte* protective order that S.V. had obtained against them. Following a hearing in which the protective order was dismissed, T.B. and Son walked outside the courthouse. S.V., who was also outside the courthouse and was "extremely upset," started "shouting" and "yelling out of anger" at T.B. and Son. (Tr. Vol. 2 at 8, 30). T.B. told Son to ignore S.V., and

---

[1] We note that the table of contents contained in Volume 1 of S.V.'s Appendix does not correspond to the pleadings and documents that are contained within Volume 2 of the Appendix.

they got into T.B.'s car. S.V. then called Son's cell phone "multiple" times. (Tr. Vol. 2 at 31). When Son answered his phone, S.V. accused him and T.B. of "lying about everything" and said "rude things," such as "calling [them] names" that included a derogatory racial slur against T.B. (Tr. Vol. 2 at 31). Son hung up his phone. S.V. then texted Son, accusing him of stealing money from her. Son responded to S.V. that her accusation was untrue, told her to talk to her business partner, and told her to stop contacting him. S.V., however, continued to text him.

[4] After that day, T.B. and Son began getting phone calls from a blocked phone number. T.B. and Son changed their phone numbers, and the blocked phone calls stopped.

[5] On October 21, 2019, T.B. started a new job and went to pick up a laptop from the corporate office. As T.B. went into the office, she saw S.V. in a motel parking lot across the street. When T.B. came out of the office, S.V. was still in the parking lot. T.B. drove away, and S.V. followed T.B. for two to three minutes. When T.B. pulled her car over to call the police, S.V. sped past T.B.

[6] On November 6, 2019, T.B. and Son were packing some moving boxes at their house, which was at a location that had been unknown to S.V. Son took some boxes to the backyard, where he saw S.V. drive up in their alley. S.V. was behind T.B.'s house "where [her] fenced[-]in parking lot was[.]" (Tr. Vol. 2 at 20). S.V. "pulled up, she put her cell phone up, she saw [Son], and then she drove off." (Tr. Vol. 2 at 27). Son dropped his boxes and ran toward the

house, "scream[ing]" for his mom. (Tr. Vol. 2 at 14). T.B. ran out the back door, and Son told her that S.V. had seen him, taken his photo, and driven away. T.B. ran down the alley and saw S.V. in her car on a nearby street. T.B. then yelled out to S.V., saying "please stop" and "[l]eave us alone, please." (Tr. Vol. 2 at 15). T.B. felt "scared" by the fact that S.V. drove up to her house and took a photo of Son because S.V. had not known T.B.'s address and had "never" gone to her house at any time during the nine years that T.B. had known S.V. (Tr. Vol. 2 at 15).

[7] That same day, T.B. filed a petition for a protective order against S.V. T.B. alleged that S.V. had committed stalking and repeated acts of harassment against her and Son. That same day, the trial court issued an *ex parte* order for the protection of T.B. and her family members against S.V.

[8] S.V. objected to the entry of the protective order, and the trial court held a hearing on T.B.'s petition on February 24, 2020. T.B. represented herself pro se, and S.V. was represented by counsel. T.B. and Son testified regarding the three incidents, as set forth above, during which T.B. alleged that S.V. had stalked or harassed them. The trial court took judicial notice of the protective order that S.V. had filed against T.B. and Son and that had been dismissed on October 14, 2019.

[9] Additionally, T.B. testified that she had been scared when S.V. was following her on October 21 because she had feared S.V. learning of the location of her new job. T.B. testified that she had lost her previous job because S.V. had

"consistently" called her former employer and had said that T.B. had stolen from her. (Tr. Vol. 2 at 12). T.B. testified that, when she had lost her job, she had also lost her house and had almost been homeless and that she "felt scared that [S.V.] was going to call [her new] job and do this again[.]" (Tr. Vol. 2 at 13).

[10] When S.V. testified, she denied that she had stalked or harassed T.B. and Son, and she gave conflicting testimony regarding the three incidents raised by T.B. For example, S.V. denied that she had yelled at T.B. and Son outside the courthouse on October 14 and denied that she had called Son's cell phone that day. Instead, S.V. testified that T.B. and Son had been waiting for her outside the courthouse and that they had run away from her when they saw her. S.V. also denied that she had followed T.B. in her car on October 21, and she testified that she had left a meeting at the motel and then had gone to run some errands. Additionally, S.V. acknowledged that she had driven in the alley behind T.B.'s house on November 1 and had seen Son. She, however, testified that she did not know that the house was theirs and that she had been driving slowly with her phone up because she had been "receiving calls[.]" (Tr. Vol. 2 at 51). She testified that she had been in the area because she had been shopping and getting a repair estimate on her car.

[11] During closing arguments, T.B. stated that there had been "a lot of animosity" between S.V. and her because T.B. was "testifying in [S.V.'s] divorce proceeding[.]" (Tr. Vol. 2 at 55). T.B. also stated that S.V. had "told [her] that she[] [was] going to ruin [T.B.'s] life for testifying against her." (Tr. Vol. 2 at

55). S.V.'s counsel argued that T.B. had not met her burden because the parties had given different accounts as to what had happened, and counsel argued that "it comes down to credibility[.]" (Tr. Vol. 2 at 56).

[12] When deciding whether to grant the protective order, the trial court stated, in part:

> You're right about the credibility of witnesses. . . . [T.B.] says there was an incident outside of court, and says she was followed, and says that [S.V.] came to her home. And [S.V.] in one shape, form, or fashion denies that those things happened. . . . And I do find [T.B.] to be a credible witness. Although I don't find [S.V.] to be a totally unbelievable witness. Who do I find to be most credible is [Son]. . . . There was testimony from [T.B.] that she was afraid. And I believe she was afraid, based on the things that [S.V.] did in incidents one and three. . . . I find by a preponderance of evidence that the protective order should remain in place.

(Tr. Vol. 2 at 57-59).

[13] Thereafter, the trial court issued an order, granting T.B.'s petition for a protective order. In its order, the trial court determined that S.V. had posed a "credible threat to the safety" of T.B. and her family members and that T.B. had met her burden of proving that stalking had occurred. (App. Vol. 2 at 25). The trial court "order[ed] the following additional relief to provide for the safety and welfare" of T.B. and her family members:

> With the exception of court proceedings at which they are ordered to be present together, [S.V.] shall remain no less than 300 feet from [T.B.] and all protected persons, . . . her residence,

and . . . her vehicle at all times. Should [S.V.] inadvertently observe [T.B.] in a public place or public road, . . . she shall depart immediately with no verbal or nonverbal communication with [T.B.]. [S.V.] shall have no contact or communication with [S.V.] via any internet sites, social media sites, texting, etc.

(App. Vol. 2 at 26). S.V. now appeals.

## Decision

[14] Before we address S.V.'s argument that there was insufficient evidence to support the issuance of the protective order, we note that T.B. did not file an Appellee's brief. When an appellee fails to submit an appellate brief, "'we need not undertake the burden of developing an argument on the [A]ppellee's behalf.'" *Front Row Motors, LLC v. Jones*, 5 N.E.3d 753, 758 (Ind. 2014) (quoting *Trinity Homes, LLC v. Fang*, 848 N.E.2d 1065, 1068 (Ind. 2006)). Rather, "'we will reverse the trial court's judgment if the appellant's brief presents a case of prima facie error.'" *Front Row Motors*, 5 N.E.3d at 758 (quoting *Trinity Homes*, 848 N.E.2d at 1068). "Prima facie error in this context is defined as, at first sight, on first appearance, or on the face of it." *Front Row Motors*, 5 N.E.3d at 758 (internal quotation marks and citation omitted).

[15] When reviewing the sufficiency of the evidence supporting a decision to issue a protective order, we do not reweigh the evidence or judge the credibility of witnesses. *A.G. v. P.G.*, 974 N.E.2d 598, 598 (Ind. Ct. App. 2012). "We look only to the evidence of probative value and reasonable inferences that support the trial court's judgment." *Id.*

[16] "Civil protective orders are governed by the Indiana Civil Protection Order Act ("CPOA")[.]" *Costello v. Zollman*, 51 N.E.3d 361, 364 (Ind. Ct. App. 2016), *trans. denied*. *See* IND. CODE §§ 34-26-5-1 *et seq*. Our legislature has explained that the CPOA "shall be construed to promote the . . . (1) protection and safety of all victims of domestic or family violence in a fair, prompt, and effective manner; (2) protection and safety of all victims of harassment in a fair, prompt, and effective manner; and (3) prevention of future domestic, family violence, and harassment." I.C. § 34-26-5-1.

[17] For purposes of the CPOA, "domestic and family violence" includes "stalking." *See* I.C. § 34-6-2-34.5. "Stalking" is defined as "a knowing or an intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened." I.C. § 35-45-10-1. "Harassment" is defined as "conduct directed toward a victim that includes but is not limited to repeated or continuing impermissible contact that would cause a reasonable person to suffer emotional distress and that actually causes the victim to suffer emotional distress." I.C. § 35-45-10-2. "Impermissible contact" includes, among other things, "[f]ollowing or pursuing the victim." I.C. § 35-45-10-3. The term "repeated" as used in the anti-stalking statute "means more than once." *Falls v. State*, 131 N.E.3d 1288, 1290 (Ind. 2019) (internal quotation marks and citations omitted). Both stalking and harassment do "not include

statutorily or constitutionally protected activity."  I.C. §§ 35-45-10-1; 35-45-10-2.

[18]    Here, the trial court determined that T.B. had met her burden of showing that S.V. had committed stalking or harassment.  S.V. contends that the trial court's determination was erroneous because the three incidents of alleged stalking occurred on a "public street" where S.V. had the "right to be" and the constitutional "right to travel." (S.V.'s Br. 6, 7).  S.V. seems to suggest that her placement on a public road was a defense to the determination that she had engaged in stalking or harassment.

[19]    First, we conclude that she has waived this argument because she made no such argument below to the trial court.  *See First Chicago Ins. Co. v. Dunn*, 141 N.E.3d 54, 61 (Ind. Ct. App. 2020) ("It is the general rule that an argument or issue raised for the first time on appeal is waived for appellate review.").  Waiver notwithstanding, we reject S.V.'s suggestion that her presence on a public road or her right to travel insulated her from the trial court finding that she had engaged in stalking.  "[T]he right to travel is not unlimited." *Falls v. State*, 130 N.E.3d 618, 622 (Ind. Ct. App.), *opinion aff'd in relevant part, vacated in part on a different issue,* 131 N.E.3d 1288 (Ind. 2019).  "More to the point, the General Assembly has passed numerous laws regarding stalking, . . . harassment, . . . and impermissible contact, which inhibit a person's actions, restrict how a person may travel, preclude when a person may interact with others, and prevent a person from talking with specific individuals." *Id.*

[20] Ultimately, S.V.'s arguments on appeal amount to nothing more than a request to reweigh the evidence and the trial court's credibility determinations. We decline to do so and affirm the trial court's issuance of an order of protection in favor T.B. and against S.V.

[21] Affirmed.

Kirsch, J., and Tavitas, J., concur.